IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

CHRISTOPHER TAYLOR,

      Defendant.

CRIMINAL CASE NO.

1:10-cr-97-02-JEC

## ORDER & OPINION

This case is before the Court on defendant Christopher Taylor's Corrected Motion to Withdraw His Plea of Guilty [217].[1] The Court has reviewed the record and the arguments of the parties and, for the reasons that follow, concludes that defendant's Motion to Withdraw His Plea of Guilty [217] should be **DENIED**.

## BACKGROUND

A federal grand jury returned an indictment, and later a superseding indictment, against Jean-Daniel Perkins charging the latter with a multitude of offences connected with Perkins' various

---

[1] Defendant filed his initial Motion to Withdraw His Plea of Guilty on December 5, 2011 [216]. The next day he filed a "corrected" Motion to Withdraw His Plea of Guilty. [217]. Defendant and the Government treat the "corrected" document as the operative motion, as will the Court. The Clerk of Court is **DIRECTED** to strike from the record defendant's initial motion [216].

and prolific fraudulent activities.  Defendant was named in one count (Count 33), along with Perkins.  (First Superseding Indictment [35] at Count 33.)  This count charged the two men with aiding and abetting each other in the trafficking of counterfeit access devices (credit-type cards), with the intent to defraud, in violation of 18 U.S.C. § 1029.

When the time came to arrest the defendant on this charge, Government agents could not find him.  Defendant acknowledges that he had been made aware by family and friends of the indictment against him, and claims that because he was unable to afford an attorney, he "went underground".  (Mot. for Bond [219] at Ex. 7, at 7; Reply [233] at 2-3.)  Almost one year later, the Government eventually found defendant in the Fulton County jail, where he was being held on an unrelated state charge.[2]  (Appl. for Writ of Habeas Corpus Ad Prosequendum [98].)

Trial as to Perkins and the defendant had been set for June 20, 2011, but defendant's counsel had advised the Court that defendant wished to enter a plea of guilty and, shortly before the trial date, the Court held a change of plea hearing for defendant to enter that

---

[2]  Defendant was one of a group of individuals arrested on drug charges when police raided a house in which they were working on a music video and from which some of the individuals dealt drugs. (Reply [233] at 3.)  The prosecution dropped the drug charges against defendant, who pled guilty to misdemeanor obstruction of justice and received time served.  (*Id.*)

2

plea of guilty. (Mins. [155].) Defendant and the undersigned engaged in a full Rule 11 colloquy during which the Court explained to the defendant all the rights he was giving up by pleading guilty, as well as advising the defendant of the usual information that is required to be communicated to a pleading defendant.

For purposes of establishing a factual basis, the Government laid out the evidence that it would be able to introduce at a trial. (*See generally* Tr. [200] at 8-12.) Essentially that evidence indicated that the defendant traveled with Perkins to a Ruby Tuesday's restaurant to meet with someone whom Perkins intended to sell counterfeit credit cards.[3] As it turned out, however, this individual was an undercover law enforcement agent. Defendant was in possession of the fraudulent cards that were being sold and, during the meeting, Perkins directed the defendant to take those cards out and show them to the undercover agent. Defendant did so, and further vouched that the buyer (the undercover agent) would be able to use these cards in stores, that these cards "rocked and rolled," and that, in fact, the defendant and Perkins had already used these cards to purchase thousands of dollars of cameras, lenses, memory cards and other items that defendant and Perkins used in the joint music video

---

[3] Perkins also manufactured other counterfeit access devices, such as gift cards. For simplicity's sake, the Court will use the term "credit cards."

production endeavor in which they were working. The Government argued that defendant's possession of the cards, his display of those cards, and his "vouching" comments concerning the ease with which the cards could be used to make purchases demonstrated that he had not only aided Perkins in his effort to sell these counterfeit credit cards, but he had necessarily done so knowingly and with the intent to defraud.

Further bolstering the Government's suggested inference was the fact that, upon a later search of Perkins' apartment, the agents found equipment that, according to the prosecutor, would have made it obvious to anyone that the apartment was "effectively a credit card producing factory." (Tr. [200] at 11-12.) That is, the kitchen island contained a magnetic stripe encoder, a laptop, and hundreds of credit cards. Defendant acknowledged that he had spent the night with Perkins on the evening prior to the Ruby Tuesday's transaction and, after that aborted transaction, defendant had returned to Perkins' apartment. Given defendant's presence in the apartment, the prosecutor argued that one could reasonably infer that defendant could readily observe that the space was being used as a counterfeit credit card production center and would have necessarily known the nature of the cards in his possession at Ruby Tuesday's.

With only a quibble or two, the defendant acknowledged the facts, as set out by the Government, to be true. The defendant could

4

AO 72A
(Rev.8/82)

not bring himself to admit, however, his awareness that the credit cards he had vouched for were counterfeit.  The Court engaged the defendant in a pain-staking colloquy concerning the facts to identify exactly what position the defendant was taking as to his knowledge. The defendant insisted that Perkins had never told him the counterfeit cards were in fact fakes, but, even so, he could never offer an explanation of why he would need to assure the buyer that the cards would work or why, indeed, it would ever be legitimate to sell credit cards to someone for whom those cards had not been issued.  (*See generally* Tr. [200] at 13-26.)

Ultimately, the Court indicated that the Government's proffer was sufficient to establish a factual basis from which a jury could reasonably infer defendant's knowledge and intent.  Nevertheless, as the defendant was unwilling to admit that he had the requisite knowledge and intent, the Court indicated that the defendant would either have to enter an *Alford* plea, if he still wanted to plead guilty, or he could go to trial if he chose to do that.  The Court further provided the standard information concerning an *Alford* plea. After conferring with counsel, the defendant indicated that he wanted to enter an *Alford* plea.  (*See generally* Tr. [200] at 26-32.)

Thereafter, a sentencing date was set for the defendant, but eleven days before that hearing, defendant filed the present motion to withdraw his plea.  (Notice of Sentencing [211]; Mot. to Withdraw

5

His Plea of Guilty [216]; Mot. to Withdraw His Plea of Guilty [217].)
It should be noted that defendant's motion to withdraw came some six
months after entry of this plea and some six months after the trial
and conviction of his co-defendant, Jean Perkins.  In other words,
given the timing of the motion, the defendant sought to unilaterally
confer on himself a severance from a trial with his co-defendant.
And, of course, should the motion be granted, the Government would
have to undergo a great expenditure of resources and time,
inconvenience trial witnesses again, and unnecessarily take the time
of a busy court to convene now a second trial on this same
indictment.

    With this factual backdrop, the Court will discuss the standards
generally applicable to the withdrawal of a plea by a defendant.
After that discussion, the Court will address defendant's contention
that his guilty plea should not stand because there was no factual
basis for the plea.

I.  **APPLICABLE LAW**

    A defendant does not have an absolute right to withdraw a guilty
plea.  *United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994),
*cert. denied*, 513 U.S. 864 (1994).  Under Federal Rule of Criminal
Procedure 11(d)(2)(B),[4] a defendant may withdraw a plea of guilty

_____

    [4]  Rule 11(d) reads in its entirety as follows:

6

"after the court accepts the plea, but before it imposes sentence" if "the defendant can show a fair and just reason for requesting the withdrawal."[5]   Thus, a defendant bears the burden when moving for withdrawal of his plea.  *United States v. Izquierdo*, 448 F.3d 1269, 1276 (11th Cir. 2006)("A defendant-movant clearly has the burden on a motion to withdraw a guilty plea.").   In evaluating whether a defendant has carried his burden, the Court must examine the "totality of the circumstances", including:

   (1)   whether close assistance of counsel was available;

   (2)   whether the plea was knowing and voluntary;

   (3)   whether judicial resources would be conserved; and

---

        A defendant may withdraw a plea of guilty or nolo contendere:

        (1) before the court accepts the plea, for any reason or no reason; or

        (2) after the court accepts the plea, but before it imposes sentence if:

            (A) the court rejects a plea agreement under Rule 11(c)(5); or

            (B) the defendant can show a fair and just reason for requesting the withdrawal.

FED. R. CRIM. P. 11(d).

   [5]   The procedure for withdrawal of a plea was previously set forth in Rule 32(d)-(e).  *See United States v. Rosen*, 409 F.3d 535, 545 (2d Cir. 2005)(discussing Rule 11(d) and its antecedents).

7

      (4)  whether the government would be prejudiced if the defendant were allowed to withdraw his plea.

*United States v. Buckles*, 843 F.2d 469, 471-72 (11th Cir. 1988) (citations omitted), *cert. denied*, 490 U.S. 1099 (1989). If the defendant does not satisfy the first two prongs of the *Buckles* analysis, the last two factors need not be given "particular attention" or "weight". *United States v. Smith*, 336 Fed. App'x 978, 981 (11th Cir. 2009)(citing *United States v. Gonzalez-Mercado*, 808 F.2d 796, 801 (11th Cir. 1987)).

In addition to the *Buckles* factors, a further consideration the court examines is the timing of the motion to withdraw. *See United States v. Durham*, 172 Fed. App'x 261, 265 (11th Cir. 2006)(citing *United States v. Rogers*, 848 F.2d 166, 168 (11th Cir. 1988)), *cert. denied*, 547 U.S. 1199 (2006). Long delays between a plea and withdrawal motion are disfavored, and "the longer the delay between the entry of the plea and the motion to withdraw it, the more substantial the reasons must be as to why the defendant seeks withdrawal." *Buckles,* 843 F.2d at 473. *See also United States v. Doyle*, 981 F.2d 591, 595 (1st Cir. 1992)("While an immediate change of heart may well lend considerable force to a plea withdrawal request, a long interval between the plea and the request often weakens any claim that the plea was entered in confusion or under false pretenses.") and *United States v. Perez-Hernandez*, 490 Fed.

App'x 275, 277 (11th Cir. 2012)(citing *Buckles*, 843 F.2d at 473)), *cert. denied*, 571 U.S. --, 134 S. Ct. 133 (2013).  A review of these factors shows that defendant has not demonstrated a "fair and just" reason for withdrawal of his plea of guilty.

**II.   ANALYSIS**

**A.   THE *BUCKLES* FACTORS**

**1.   Close Assistance of Counsel Was Available**

Defendant concedes, and the Court agrees, that close assistance of counsel was available to him.  (Reply [233] at 10.)  Counsel assisted defendant during the plea hearing, defendant acknowledged that he had discussed the case with his counsel, and defendant stated that he was satisfied with his representation.  (Tr. [200] at 12-18; 12-25; 13.)  Indeed, defendant's counsel is a very able and experienced criminal defense attorney.  These facts demonstrate that close assistance of counsel was available to defendant, which weighs against him in his request to withdraw his guilty plea.  *See United States v. Flint*, 156 Fed. App'x 252, 255 (11th Cir. 2005)(finding that defendant had close assistance of counsel because he was assisted by counsel during the plea hearing, he acknowledged that he had discussed the case with his counsel, and he stated that he was satisfied with his counsel's representation), *cert. denied*, 547 U.S. 1049 (2006).

9

###### 2.   The Plea Was Knowing and Voluntary

A knowing and voluntary plea has three requirements: "(1) the guilty plea must be free from coercion; (2) the defendant must understand the nature of the charges; and (3) the defendant must know and understand the consequences of his guilty plea." *United States v. Mosley*, 173 F.3d 1318, 1322 (11th Cir. 1999). Defendant's plea satisfies these requirements.

###### a.   Defendant's plea was free from coercion

During the plea colloquy the Court inquired into whether defendant was threatened, forced, or coerced into pleading guilty. (Tr. [200] at 32.) Although defendant's lack of enthusiasm for pleading guilty was evident, he confirmed that he was neither threatened nor forced into pleading guilty and stated that he was pleading guilty freely and voluntarily. (*Id.* at 28, 32.) Indeed, in the lengthy colloquy between the Court and defendant, the undersigned made it clear to the defendant that he did not have to plead guilty if he did not want to do so. Defendant also informed the Court that he was not promised a specific sentence in exchange for his plea. (*Id.* at 35.) These "[s]olemn declarations in open court carry a strong presumption of verity" that has not been overcome. *See United States v. Bohning*, 321 Fed. App'x 855, 859 (11th Cir. 2009)(citing *Jones v. White*, 992 F.2d 1548, 1556 (11th Cir. 1993)).

Defendant now belatedly offers conclusory assertions that his

10

decision to plead guilty was driven by concerns over threats to himself, his significant other, and his son, and he further asserts that his significant other actually received a threat in this time period, although the relationship between the threat and Perkins is not clear. (Mot. to Withdraw His Plea of Guilty [217] at 16; Mot. for Bond [219] at Ex. 7, at 6.) But defendant did not raise these concerns prior to filing his motion to withdraw his plea and he even agreed during the plea colloquy that no one had "threatened or forced [him] to plead guilty". (Tr. [200] at 32.) Similarly, defendant's attorney knew of no reason the Court should not accept the plea. (*Id.* at 37.)

As noted, defendant offers no explanation how the threats were intended to extort a guilty plea; he merely asserts that they concerned him and that they were somehow connected to Perkins. This tardy reliance on vague threats from unknown persons with an unclear connection to Perkins cannot rebut defendant's sworn statements to the Court that he was under no undue pressure when pleading guilty.

Defendant also suggests that his decision to plead guilty was influenced by his incarceration and his desire to return to his family. (*Id.* at 28; Mot. to Withdraw His Plea of Guilty [217] at 16.) However, family pressures and the stress of incarceration are of no relevance to the voluntariness of defendant's plea. *See Buckles*, 843 F.2d at 472 ("All pleas of guilty are the result of some

11

pressures or influences on the mind of the defendant.")(citing *Schnautz v. Beto*, 416 F.2d 214, 215 (5th Cir. 1969)).  A person charged with a crime will always be under stress, but that stress does not, by itself negate the voluntariness of a defendant's plea. *Stano v. Dugger*, 921 F.2d 1125, 1142 (11th Cir. 1991)("Unavoidable influence or pressure from sources such as codefendants, friends or family does not make a plea involuntary")(citing *LoConte v. Dugger*, 847 F.2d 745, 753 (11th Cir. 1988)).  In short, the Court concludes that defendant's plea was free of coercion, as is evidenced by his admissions and conduct at the plea hearing.   *United States v. Lancaster*, 137 Fed. App'x 316, 319 (11th Cir. 2005)(holding that a plea was knowing and voluntary where defendant, among other things, "stated that his plea was not coerced").

>    **b.   Defendant understood the nature of the charge against him**

To ensure that defendant understood the nature of the charge against him, the Government outlined the crime defendant allegedly committed, the elements that it would have to prove at trial to obtain a conviction, and the evidence that it expected to introduce to make that proof.  (Tr. [200] at 8-12, 18-19.)  Defendant stated that he had discussed the charge with his counsel and understood it. (*Id.* at 12.)  After the Government made its factual presentation, defendant demonstrated his knowledge of the nature of the charge he

faced by engaging the Court in a long dialogue regarding the requirement that he had *knowingly* trafficked in fraudulent access cards. (*Id.* at 13-26.) Specifically, defendant stated that Perkins had never told him that the cards were counterfeit, and he did so for the purpose of telling the Court that he lacked knowledge of this fact. Defendant's emphasis on this implicit lack of knowledge indicated an awareness that such knowledge and/or intent to defraud was a necessary element of the offense. (*Id.* at 18, 21-26.) Given the Government's proffer and defendant's own statements, it is clear that defendant understood the nature of the charge against him. *See Flint*, 156 Fed. App'x at 255 (holding that plea was knowing and voluntary where defendant "heard the government's proffer of the case against him") and *Lancaster*, 137 Fed. App'x at 319 (holding that plea was knowing and voluntary where defendant "understood the nature of the charge"). Yet, even though he raised questions about one of the elements that the Government would have to prove to obtain a conviction, defendant still chose to plead guilty.

### c. Defendant understood the consequences of pleading guilty

The Court informed defendant of the consequences of pleading guilty. The Court described to defendant the penalties associated with the offense of conviction, the general application of the Sentencing Guidelines, and the Court's discretion to impose a

13

sentence that deviated from the Guidelines. (Tr. [200] at 31-32, 32-35); *United States v. Martines-Chaves*, 131 Fed. App'x 151, 158 (11th Cir. 2005)("The district court also informed Martines-Chaves of the maximum and minimum penalties for her offense, so she was fully aware of the consequences of her guilty plea."). The Court further described the constitutional rights that defendant relinquished by pleading guilty, which waiver defendant acknowledged. (Tr. [200] at 4-7); *see Flint*, 156 Fed. App'x at 255 (holding that plea was knowing and voluntary where defendant, among other things, "understood that, by pleading guilty, he was giving up several rights"). And although defendant's attorney had not previously discussed the nature of an *Alford* plea with him, given counsel's awareness that it was Department of Justice policy to oppose such a plea, the Court explained an *Alford* plea to defendant. (Tr. [200] at 26-26, 27, 29-23, 30-31.) After this explanation and consultation with his counsel, defendant stated that he still wished to plead guilty. (*Id.* at 30.) Finally, defendant acknowledged that pleading guilty would mark him as a felon, but indicated that this was a consequence with which he was "willing to get along in life if he had to". (*Id.* at 28; Mot. for Bond [219] at Ex. 7, at 8-9.)

In conclusion, defendant's plea was knowing and voluntary because it was free from coercion, because defendant knew the nature of the charge against him, and because defendant understood the

14

consequences of pleading guilty.   This factor therefore weighs against permitting defendant to withdraw his plea of guilty.

### d. The assertion of factual innocence does not negate an otherwise valid plea

Although all three requirements of a knowing and voluntary plea have been met, defendant contends, nonetheless, that the plea was not "knowing in the sense that [he] did not admit intent." (Reply [233] at 1-2, 12.)  Defendant's argument appears to confuse "knowing" as a *mens rea* requirement of the underlying offense with the defendant's knowledge of the consequences of pleading guilty.  Fundamentally, defendant appears to argue that he is legally innocent and thus could not knowingly enter a guilty plea, but this claim is not a proper basis upon which to withdraw his plea of guilty.  *Buckles*, 843 F.2d at 472 ("A mere declaration of innocence does not entitle a defendant to withdraw his guilty plea.").   This is especially so because defendant entered an *Alford* plea.[6]  (Tr. [200] at 29-30.)

Under an *Alford* plea, it does not matter whether defendant admitted that he had the requisite intent for the crime charged:  in

---

[6]  In an *Alford* plea, a defendant permits judgment to be entered against him on an intelligent plea of guilty that is accompanied by a claim of innocence.  *North Carolina v. Alford*, 400 U.S. 25, 37 (1970)("An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime.").   In other words, a defendant may plead guilty because it is in his best interest, even though he makes assertions of fact that would negate his guilt.  *Id.*

15

this case, knowledge that the cards defendant held for and passed to Perkins were counterfeit. *See United States v. Buckley*, 847 F.2d 991, 998 n.4 (1st Cir. 1988)(rejecting argument that defendant should be allowed to withdraw his plea because he lacked the *mens rea* for the alleged offenses, as "[t]his argument misses the whole point of [the] *Alford* plea"). Permitting a defendant to withdraw an *Alford* plea upon a bare assertion of innocence would render such pleas meaningless. *See Buckles*, 843 F.2d at 472-73 ("Guilty pleas would be of little value to the judicial system if a defendant's later conclusory assertion of innocence automatically negated his plea."). "By definition, defendants who make *Alford* pleas do not deny their legal innocence. This does not mean they can withdraw these pleas willy-nilly." *Buckley*, 847 F.2d at 998 n.4.

Here, defendant contends that his plea should be withdrawn for precisely the same reason that he entered an *Alford* plea at the hearing: a lack of knowledge that the credit cards at issue were fraudulent. (*Compare* Tr. [200] at 25-24 *with* Motion to Withdraw His Plea of Guilty [217] at 14-15.) The purpose of permitting a defendant to withdraw a guilty plea is "not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty." *United States v. Carr*, 740 F.2d 339, 345 (5th Cir. 1984), *cert. denied*, 471 U.S. 1004 (1985). Defendant's claim of

16

ignorance essentially reasserts the claim he made during the plea colloquy.

>    **3.   Judicial Resources Would Be Needlessly Wasted and The Government Would Be Greatly Prejudiced if Withdrawal of the Plea Were Permitted.**

Defendant does not satisfy the third or fourth elements of the *Buckles* test as both judicial and prosecutorial resources would be needlessly squandered should defendant be allowed to withdraw his plea.

Defendant pled guilty on the eve of trial. Shortly thereafter, a trial commenced against Perkins. Over a long and arduous week, jurors were interviewed, witnesses were questioned, recorded conversations were played, photographic exhibits were tendered, and legal arguments were made. A jury deliberated and rendered a verdict of guilty as to defendant's co-defendant, Jean Perkins. Defendant now asks the Court to conduct that process all over again.[7] *See Flint*, 156 Fed. App'x at 256 ("[J]udicial resources would be conserved by denying Flint's motion because the government had tried Flint's codefendants three months before and would now have to bear

_____

[7]   In his motion to withdraw, defendant makes the comment that "[i]t is possible that Mr. Taylor will change his mind and agree to plead guilty". (Motion to Withdraw His Plea of Guilty [217] at 16.) It would certainly be a waste of judicial resources for the Court to permit defendant to withdraw his plea now, only for him to re-enter a guilty plea at a later date. Not to mention all the time that this Court has now had to spend in resolving the present motion to withdraw.

the expense of a separate trial.").

Indeed, the timing of defendant's motion to withdraw his plea is troubling.  Specifically, if defendant had had a change of heart immediately after his plea, the Court would have let him withdraw his plea and he could have then gone to trial with his co-defendant, Perkins.  *See United States v. Barker*, 514 F.2d 208, 222 (D.C. Cir. 1975), *cert. denied*, 421 U.S. 1013 (1975)(a "swift change of heart" may indicate that the defendant entered the plea in haste and confusion and justify withdrawal; whereas, when a defendant has had competent counsel at all times and has "long delayed" his withdrawal motion, the reasons for withdrawal "must have considerably more force;" *United States v. Gonzalez*, 970 F.2d 1095, 1100 (2d Cir. 1992) ("The fact that a defendant has a change of heart prompted by his reevaluation of either the Government's case against him or the penalty that might be imposed is not a sufficient reason to permit withdrawal of a plea.").

But defendant's buyer's remorse occurred only after the Government and Court had gone through the trouble of a very difficult trial of the co-defendant.  Then some six months later, on the eve of his sentencing, defendant brings this motion.  Success by defendant on this effort to withdraw his plea would result in one of two consequences.  First, the Government, both of whose trial counsel left the U.S. Attorney's Office shortly after Perkins' trial, could

18

select a new prosecutor to handle the trial of defendant. Albeit defendant was a bit player in Perkins' activities, the new prosecutor would nonetheless have to master much of the massive record in this case to determine which parts of its evidence should be introduced against the defendant. And even though the transaction between the defendant, Perkins, and the undercover agent at Ruby Tuesday's was not lengthy or complicated, explaining to the jury the backdrop of Perkins' operation would require some time: both at trial and in pre-trial preparation by the prosecutor.

A second trial on this indictment would require witnesses to again be inconvenienced. Finally, a busy court would have to unnecessarily waste its resources in trying a defendant whose fate could have readily been determined in the first trial of Perkins.

That leads to the second option: the Government could reluctantly decide not to expend its own limited resources in trying the defendant, particularly given the presumably light sentence to which he would be exposed. Perhaps, that is defendant's hope here. But that result would certainly create a bad precedent, would undermine the finality that should attach to a valid guilty plea, and would reward a defendant who had every opportunity to go to trial, but who chose to plead guilty.

In sum, defendant's motion does not present any new, persuasive arguments for withdrawal, but rather restates and refines, in more

19

lawyerly language, defendant's reluctance at his guilty plea hearing to acknowledge his intent to commit the charged offense.  Yet, in going forward with an *Alford* plea, regardless of the possibility of making a winning argument to a jury, the defendant cast his lot with a guilty plea.  That he now may wish he had rolled the dice by trying out these arguments before a jury is a regret that he will have to live with.  It is not the Court or the Government's job to ease that regret.

In short, defendant has not shown a "fair and just" reason for withdrawal of his plea of guilty.

**B.  THERE IS A FACTUAL BASIS FOR THE PLEA**

In asking that he be allowed to withdraw his plea, defendant focuses most of his argument on his insistence that there is no factual basis for the plea.  Ensuring that a factual basis for a plea exists is one of several ways to confirm that a guilty plea results from a voluntary and intelligent decision.  *See United States v. Gomez-Gomez*, 822 F.2d 1008, 1011 (11th Cir. 1987)("Requiring that the judge assure himself of the plea's factual basis is but one of several ways the rule ensures that a guilty plea results from a voluntary and intelligent decision.").  A review of the colloquy demonstrates a sufficient factual basis for the Court to accept the plea.

To obtain a conviction for access device fraud, the Government

AO 72A
(Rev.8/82)

must prove that "the Defendant knowingly trafficked in a counterfeit access device; the Defendant knew the access device was counterfeit, and acted with the intent to defraud or deceive; and the Defendant's conduct affected interstate or foreign commerce." ELEVENTH CIR. CRIM. PATTERN JURY INSTRUCTIONS § 41.1 (2010). The "'heart of the crime' is the knowing use of a counterfeit access device with intent to defraud." *Id.*

The Court has earlier summarized the evidence that the Government proffered at defendant's guilty plea hearing. *See* discussion *supra* at 3-5. Specifically, the proof clearly indicated the *actus reus* component of the offense: the defendant accompanied Perkins to a transaction in which Perkins intended to, and did, negotiate with a potential buyer to purchase counterfeit "access devices." At that transaction, it was the defendant who possessed the counterfeit cards and who, on the request of Perkins, showed those cards to the potential buyer, and vouched for them.

As to the *mens rea*, defendant stated at the plea hearing that Perkins had never told him that the cards were counterfeit. Yet, there was ample evidence from which a reasonable person could infer that the cards were not authentic and could further infer that defendant would have drawn the same conclusion. First, one must question how the defendant could have ever assumed any legitimate purpose to the transaction in which he was embarking with Perkins.

21

After all, under what circumstances could one plausibly assume that the sale of these credit/gift cards was legitimate? If a person wants to acquire a credit card in a non-fraudulent, lawful manner, he applies for the credit card with the card issuer. What he does not do is attend a clandestine meeting in which multiple cards not in the buyer's name are offered for his purchase. Similarly, if a person is legitimately selling a gift card, he does not purchase such cards at full retail and then sell them at a discount. In fact, when directly asked at the plea colloquy, the defendant was never able to come up with a coherent explanation of how he could have thought this meeting with the potential buyer, and the items being peddled, was on the up-and-up.

Second, the defendant made statements during the meeting in which he tried to bolster the usability of the cards. When prompted by Perkins, defendant told the undercover agent that he and Perkins had used these cards to purchase thousands of dollars of equipment and that the Discover-brand cards, in particular, "rock[] and roll[]." (*Id.* at 10.) That defendant was ready with a reassuring endorsement of the cards when prompted by Perkins suggests that the two had discussed the negotiation ahead of time and that the defendant was aware that his role was to assure the potential buyer that the latter would not face any hassle from a merchant when the buyer tried to use the cards to make purchases. Again, it makes no

22

sense that one would need to vouch for cards that are the subject of a legitimate transaction, if one can even envision a legitimate transaction in which someone other than a card issuer is trying to "sell" a card.

Further, the Government proffered evidence that their search of Perkins' apartment revealed it to be full of equipment used to manufacture credit cards and that there were hundreds of credit cards laying around the apartment.  As defendant acknowledged he had spent the night in Perkins' apartment the night before the Ruby Tuesday's meeting and been there that morning before the meeting, the Government argued that one could infer that defendant would have been on notice of the method by which Perkins had obtained these cards and would then have necessarily known that they were counterfeit.[8]

─────────────────

[8] Defendant claims that his stay at Perkins's apartment was just a happenstance, resulting the night before from a late night at the recording studio and a flat tire on the car that he was driving. (Mot. to Withdraw His Plea of Guilty [217] at 5-9.)  He further argues that he would not have necessarily observed or been aware of the significance of the card-making equipment in Perkins' apartment, given his short stay. (*Id.* at 12-13.)  In addition, defendant avers that Perkins had said that the meeting at Ruby Tuesday's was with a potential investor for Perkins's legitimate music business. (*Id.* at 7-8.)

None of this affects the strength of the factual basis offered by the Government, however.  Whether or not any of the above arguments might potentially undermine the inferences reached by the Government from the proffered evidence, they are arguments that would have been appropriate to make to a jury.  Again, none of these arguments diminish the factual basis proffered by the Government, from which factual basis a reasonable juror could infer that

In short, the Court concludes that there was an adequate factual basis for the plea of guilty.

### CONCLUSION

For the foregoing reasons, defendant's Motion to Withdraw His Plea of Guilty [217] is **DENIED**.

SO ORDERED, this 22nd day of July, 2014.


/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

_____

defendant was aware of the fraudulent nature of this attempted transaction and that the intent element of the offense was thereby satisfied.